**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE U.S. VISION DATA BREACH LITIGATION | Case No. 22-cv-06558 |
| This Document Relates To: All Matters | **CLASS ACTION** |
| | **JURY TRIAL DEMANDED** |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Ian Torres, Bonita Odell, and Lacie Morgan ("Plaintiffs"), individually, and on behalf of all others similarly situated ("Class members"), by and through their attorneys, bring this Class Action Complaint against Defendants U.S. Vision, Inc. ("U.S. Vision"), USV Optical, Inc. ("USV"), and Nationwide Optometry, P.C. ("Nationwide") (collectively "Defendants"), and complain and allege upon personal knowledge as to themselves and information and belief as to all other matters.

## INTRODUCTION

1.      Plaintiffs bring this class action against Defendants for their failure to secure and safeguard their and approximately 711,072 other individuals' personally identifying information ("PII") and protected health information ("PHI"), including names, dates of birth, addresses, Social Security numbers, taxpayer identification numbers, driver's license or state identification numbers, financial account information, medical and/or treatment information, health insurance information, billing and claims information, biometric data, email addresses, usernames, and passwords.

2.      U.S. Vision is a company that provides eyecare services and sells eyecare products. U.S. Vision is incorporated in Delaware with its principal place of business located in Blackwood, New Jersey.

3.      USV is a subsidiary of U.S. Vision. USV is incorporated in Texas, with its principal

place of business located in Blackwood, New Jersey.

4.      Nationwide is an eyecare service provider. Nationwide is a professional corporation formed in Arizona with its principal place of business is located in Chandler, Arizona.

5.      Between April 20, 2021 and May 17, 2021, an unauthorized individual, or unauthorized individuals, gained access to U.S. Vision's network systems and accessed and acquired files from the system that contained the PII/PHI of Plaintiffs and Class members (the "Data Breach").

6.      Defendants owed a duty to Plaintiffs and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. Defendants breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect their patients' PII/PHI from unauthorized access and disclosure.

7.      As a result of Defendants' inadequate security and breach of their duties and obligations, the Data Breach occurred, and Plaintiffs' and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiffs bring this action on behalf of themselves and all persons whose PII/PHI was exposed as a result of the Data Breach, which U.S. Vision says it learned of on or about May 12, 2021.

8.      Plaintiffs, on behalf of themselves and all other Class members, assert claims for negligence, negligence per se, breach of fiduciary duty, breach of implied contract, unjust enrichment, violations of the Arizona Consumer Fraud Act, violations of the Oklahoma Consumer Protection Act, and violations of the New Jersey Consumer Fraud Act, and seek declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

*Plaintiff Ian Torres*

9.      Plaintiff Ian Torres is an Arizona resident.

10.     Plaintiff Torres previously obtained eyecare services from Nationwide.

11.     Plaintiff Torres received a letter from Nationwide dated October 28, 2022, which notified him that his PII/PHI was accessed in the Data Breach.

12.     Plaintiff Torres would not have sought services from or provided his PII/PHI to Defendants had he known that his information would not be adequately safeguarded by Defendants.

13.     Plaintiff Torres stores any documents containing PII/PHI in a safe and secure location. Plaintiff Torres does not knowingly transmit unencrypted PII/PHI over the internet. Plaintiff Torres also uses unique complex passwords and/or two factor authentication for online accounts storing sensitive PII/PHI.

14.     Plaintiff Torres experienced actual identify theft and fraud, which he discovered after receiving a letter from the U.S. Internal Revenue Service (the "IRS Letter"), dated September 29, 2022, explaining that an unauthorized person attempted to impersonate Plaintiff Torres by using his name and taxpayer ID number to file a false tax return. The IRS Letter stated that Plaintiff Torres may be the victim of identity theft.

15.     As a result of the attempted fraud on Plaintiff Torres' tax return, the IRS placed an identity theft indicator on Plaintiff Torres' taxpayer identification number that will be reviewed by the IRS on all future tax returns filed by Plaintiff Torres. Plaintiff Torres must also use an identity protection personal ID number ("IP PIN") on all future tax returns for the remainder of his life. This unique ID PIN changes each December or January. As a result, Plaintiff Torres must

continually acquire and enter a new ID PIN for every tax return he files for the remainder of his life.

16.     Plaintiff Torres is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII/PHI, in combination with his name, being placed in the hands of unauthorized third parties/criminals. This injury was worsened by Defendants' 17-month long delay in informing Plaintiffs and Class members about the Data Breach.

17.     Plaintiff Torres was forced to spend several hours attempting to resolve issues related to the Data Breach and the resulting tax fraud that he suffered. This includes, but is not limited to, at least 4 hours attempting to reach and speaking with the IRS, and several hours reviewing financial account statements and medical records for indications of actual or attempted identity theft or fraud.

18.     Plaintiff Torres has a continuing interest in ensuring that his PII/PHI, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

19.     As a direct result of the Data Breach, Plaintiff Torres has suffered injury by the loss of privacy due to having his PII/PHI accessed and exfiltrated without his consent.

20.     As a direct result of the Data Breach, Plaintiff Torres has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII/PHI; deprivation of the value of his PII/PHI; and overpayment for services that did not include adequate data security.

***Plaintiff Bonita Odell***

21.     Plaintiff Bonita Odell is an Arizona resident.

22.    From approximately 2019 to 2020, Plaintiff Odell obtained eyecare services from Nationwide.

23.    Plaintiff Odell received a letter from Nationwide in or about October of 2022, which notified her that her PII/PHI was accessed in the Data Breach.

24.    Plaintiff Odell would not have sought services from or provided her PII/PHI to Nationwide had she known that her information would not be adequately safeguarded by Defendants.

25.    As a result of the Data Breach, Plaintiff Odell has suffered a dramatic increase in the number of spam telephone calls she receives. Since the Data Breach, these spam calls have become a constant source of frustration for her and her family.

26.    Plaintiff Odell is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from her PII/PHI, in combination with her name, being placed in the hands of unauthorized third parties/criminals. This injury was worsened by Defendants' 17-month long delay in informing Plaintiffs and Class members about the Data Breach.

27.    Plaintiff Odell has a continuing interest in ensuring that her PII/ PHI, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

28.    As a direct result of the Data Breach, Plaintiff Odell has suffered injury by the loss of privacy due to having her PII/PHI accessed and exfiltrated without her consent.

29.    As a direct result of the Data Breach, Plaintiff Odell has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PHI;

deprivation of the value of her PII/PHI; and overpayment for services that did not include adequate data security.

***Plaintiff Lacie Morgan***

30.     Plaintiff Lacie Morgan is an Oklahoma resident.

31.     On or about November 5, 2022, Plaintiff Morgan received a letter from Defendants, dated October 28, 2022, notifying her that her PII/PHI had been improperly accessed and/or obtained by unauthorized third parties in the Data Breach.

32.     Shortly after and as a result of the Data Breach, Plaintiff Morgan discovered numerous unauthorized charges totaling approximately $2,000 on her bank account statements. As a result of these unauthorized charges and the Data Breach in general, Plaintiff Morgan was assessed $250-$300 in fees. As a result of these unauthorized charges and the Data Breach in general, Plaintiff Morgan's credit score was also lowered causing her to be unable to obtain a home loan. As a result of these unauthorized charges and the Data Breach in general, Plaintiff Morgan was also unable to pay her daughter's medical bills and had to seek financial assistance and obtain two loans. As a result of these unauthorized charges and the Data Breach in general, Plaintiff Morgan was also unable to pay her credit card bills. As a result of these unauthorized charges and the Data Breach in general, Plaintiff Morgan had to cancel her debit card and, thus, lost access to her funds while she awaited the arrival of her new card.

33.     Shortly after and as a result of the Data Breach, Plaintiff Morgan suffered from identity theft in 2021. Specifically, numerous subscriptions were opened in her name and charged to her bank account.

34.     Shortly after and as a result of the Data Breach, Plaintiff Morgan has experienced an increase in spam and suspicious phone calls, texts, and emails.

35.    As a result of these unauthorized charges, identity theft, impacted credit score, and the Data Breach in general, Plaintiff Morgan was unable to obtain financing for a car in 2021.

36.    Plaintiff Morgan has spent more than 40 hours responding to and dealing with the effects of the Data Breach and will continue to spend valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation.

37.    Plaintiff Morgan is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from her PII/PHI, in combination with her name, being placed in the hands of unauthorized third parties/criminals. This injury was worsened by Defendants' 17-month long delay in informing Plaintiffs and Class members about the Data Breach.

38.    Plaintiff Morgan has a continuing interest in ensuring that her PII/PHI, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

39.    As a direct result of the Data Breach, Plaintiff Morgan has suffered injury by the loss of privacy due to having her PII/PHI accessed and exfiltrated without her consent.

40.    As a direct result of the Data Breach, Plaintiff Morgan has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PHI; deprivation of the value of her PII/PHI; and overpayment for services that did not include adequate data security.

### Defendants

41.    Defendant U.S. Vision, Inc. is a Delaware corporation with its principal place of business in Blackwood, New Jersey. U.S. Vision's headquarters are located at 1 Harmon Drive,

Blackwood, New Jersey 08012. U.S. Vision may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

42. Defendant USV Optical, Inc. is a Texas corporation with its principal place of business in Blackwood, New Jersey. USV's headquarters are located at 1 Harmon Drive, Blackwood, New Jersey 08012. USV may be served through its registered agent: Corporation Service Company, d/b/a CSC Lawyers Incorporated, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

43. Defendant Nationwide Optometry, P.C. is a professional corporation formed in Arizona. Nationwide's principal place of business is 220 North McKemy Avenue, Chandler, Arizona 85226. Nationwide may be served through its registered agent: C T Corporation System, 38900 North Central Avenue, Suite 460, Phoenix, Arizona 85012.

## JURISDICTION AND VENUE

44. The Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from the citizenship of all of Defendants' members, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

45. This Court has personal jurisdiction over U.S. Vision, Inc. and USV Optical, Inc. because U.S. Vision, Inc. and USV Optical, Inc. have their principal place of business in New Jersey.

46. This Court has personal jurisdiction over Nationwide Optometry, P.C. because Nationwide contracted with U.S. Vision, which has its principal place of business in New Jersey, and shared Plaintiffs' PII/PHI with U.S. Vision in New Jersey.

47.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because U.S. Vision, Inc. and USV Optical, Inc.'s principal place of business is in New Jersey; Nationwide Optometry P.C. does business with U.S. Vision, Inc. in this District; and a significant amount of the events leading to Plaintiffs' causes of action occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of Defendants*

48.     U.S. Vision "is a retailer of optical products and services."[1] U.S. Vision "provide[s] a wide variety of services including comprehensive eye exams, contact lens fittings, and [prescription] updates."[2] In the regular course of its business, U.S. Vision collects and maintains the PII/PHI of its patients and its affiliates' patients.

49.     USV is a subsidiary of U.S. Vision.[3]

50.     Nationwide "provides complete eye care services," including care relating to "routine exams, glasses, [and] contact lenses."[4] Nationwide also provides services for cataracts, glaucoma, macular degeneration, and pterygium treatment.[5]

51.     U.S. Vision boasts that "U.S. Vision, Inc. [] respects your privacy and are committed to protecting it . . . ."[6] U.S. Vision also declares that "We apply technical, administrative and organizational security measures to protect the data we collect against accidental or unlawful

---

[1] *Homepage*, U.S. VISION, https://www.usvision.com/ (last accessed Mar. 21, 2023).

[2] *About U.S. Vision*, U.S. VISION, https://www.usvision.com/about-us/ (last accessed Mar. 21, 2023).

[3] *See* Notice of Data Security Incident, NATIONWIDE, https://response.idx.us/incident-information/ (last accessed Mar. 21, 2023).

[4] *Nationwide Vision Eye Care Services in Arizona*, Nationwide Vision, https://www.nationwidevision.com/eye-care-services (last accessed Mar. 21, 2023).

[5] *See id.*

[6] *Privacy Policy*, U.S. Vision, https://www.usvision.com/privacy-policy/ (last accessed Mar. 21, 2023).

destruction and loss, alteration, unauthorized disclosure or access, in particular, where the processing involves the transmission of data over a network and against other unlawful forms of processing."[7]

52.    Nationwide's website contains a privacy policy which states, "[Nationwide] takes the privacy of its users' . . . information very seriously."[8] The policy goes on to state that Nationwide will not share its patients' personal information except in enumerated circumstances.[9] The policy also states, "We are required by applicable law to maintain the privacy of your health information."[10] The policy further states, "We follow generally accepted industry standards to protect the personal information submitted to us, and to protect against loss, misuse or alteration of your information."[11]

53.    U.S. Vision and USV provided medical practice management and other administrative services for Nationwide. To utilize those services, Nationwide provided U.S. Vision and USV with the PII/PHI of Nationwide's patients and customers. U.S. Vision and USV then collected, stored, and maintained the PII/PHI of Nationwide's patients and customers.

54.    Plaintiffs and Class members are, or were, patients of Defendants and entrusted Defendants with their PII/PHI.

***The Data Breach***

55.    Between April 20, 2021 and May 17, 2021, an unauthorized individual, or unauthorized individuals, gained access to U.S. Vision's network systems and accessed and

---

[7] *Id.*

[8] *Privacy Policy*, Nationwide Vision, https://www.nationwidevision.com/privacy-policy (last accessed Mar. 21, 2023).

[9] *See id.*

[10] *Id.*

[11] *Id.*

acquired certain files on U.S. Vision's computer systems.

56.    The Data Breach impacted current and former patients of U.S. Vision, Nationwide, as well as Sightcare, Inc., an Arizona eyecare provider.[12]

57.    U.S. Vision notified Nationwide about the Data Breach on May 12, 2021. The notice that Nationwide posted to its website states that the information that the cybercriminal had access to includes the following PII/PHI:

> (1) identifying information (such as full name, date of birth, and address); (2) Social Security number, taxpayer identification number, driver's license or state identification number, and/or financial account information; (3) medical and/or treatment information (such as medical record number, dates of service, provider name, diagnosis or symptom information, and prescription/medication); (4) health insurance information (such as payor and subscriber/Medicare/Medicaid number); and (5) billing and claims information . . . . For a limited number of individuals, biometric data and/or email address or username and password were also included in the affected data.[13]

58.    Defendants' notice states that their investigation into the Data Breach revealed that "files containing [patients'] information may have been viewed and/or taken by the unauthorized individual."[14]

### *Defendants Knew that Criminals Target PII/PHI*

59.    At all relevant times, Defendants knew, or should have known, that the PII/PHI that they collected was a target for malicious actors. Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiffs' and Class members' PII/PHI from cyber-attacks that Defendants should have anticipated and guarded against.

---

[12] *See Notice of Data Security Incident*, *supra* n.3.
[13] *Id.*
[14] *Id*.

60.    It is well known amongst companies that store sensitive personally identifying information that sensitive information—such as the Social Security numbers ("SSNs") and medical information stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[15]

61.    Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2023 report, the healthcare compliance company Protenus found that there were 956 medical data breaches in 2022 with over 59 million patient records exposed.[16] This is an increase from the 758 medical data breaches which exposed approximately 40 million records that Protenus compiled in 2020.[17]

62.    PII/PHI is a valuable property right.[18] The value of PII/PHI as a commodity is measurable.[19] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory

---

[15] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 A.M.), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1 (last accessed Mar. 21, 2023).

[16] *See* PROTENUS, *2023 Breach Barometer*, PROTENUS.COM, https://www.protenus.com/breach-barometer-report (last accessed Mar. 21, 2023).

[17] *See id.*

[18] *See* Marc van Lieshout, *The Value of Personal Data*, 457 INT'L FED'N FOR INFO. PROCESSING 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data (last accessed Mar. 21, 2023).

[19] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (April 28, 2014), http://www.medscape.com/viewarticle/824192 (last accessed Mar. 21, 2023).

frameworks."[20] American companies are estimated to have spent over $19 billion on acquiring

personal data of consumers in 2018.[21] It is so valuable to identity thieves that once PII/PHI has

been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many

years.

63.     As a result of the real and significant value of this material, identity thieves and

other cyber criminals have openly posted credit card numbers, SSNs, PII/PHI, and other sensitive

information directly on various Internet websites making the information publicly available. This

information from various data breaches, including the information exposed in the Data Breach,

can be readily aggregated and become more valuable to thieves and more damaging to victims.

64.     PHI is particularly valuable and has been referred to as a "treasure trove for

criminals."[22] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten

personal identifying characteristics of an individual."[23]

65.     All-inclusive health insurance dossiers containing sensitive health insurance

information, names, addresses, telephone numbers, email addresses, SSNs, and bank account

information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each

---

[20] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD LIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en (last accessed Mar. 21, 2023).
[21] *See* IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.COM (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/ (last accessed Mar. 21, 2023).
[22] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAGAZINE (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon ("*What Happens to Stolen Healthcare Data*") (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.") (last accessed Mar. 21, 2023).
[23] *Id.*

on the black market.[24] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[25]

66.    Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[26] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[27]

67.    Consumers place a high value on the privacy of that data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[28]

---

[24] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market (last accessed Mar. 21, 2023).

[25] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf (last accessed Mar. 21, 2023).

[26] *What Happens to Stolen Healthcare Data*, *supra* n.22.

[27] *Id.*

[28] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1 (last accessed Mar. 21, 2023).

68.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

### Theft of PII/PHI Has Grave and Lasting Consequences for Victims

69.     Theft of PII/PHI is serious. The FTC warns consumers that identity thieves use PII/PHI to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[29]

70.     Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[30] According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver's license or ID; use the victim's information in the event of arrest or court action.[31]

---

[29] *See* Federal Trade Commission, *What to Know About Identity Theft*, FED. TRADE COMM'N CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Mar. 21, 2023).

[30] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[31] *See* Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (Sep. 1, 2017), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/ (last accessed Mar. 21, 2023).

71.     With access to an individual's PII/PHI, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture; using the victim's name and SSN to obtain government benefits; or, filing a fraudulent tax return using the victim's information. In addition, identity thieves may even give the victim's personal information to police during an arrest.[32]

72.     Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[33]

73.     Theft of SSNs also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of her SSN, and a new SSN will not be provided until after the harm has already been suffered by the victim.

74.     Due to the highly sensitive nature of SSNs, theft of SSNs in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you don't have a credit freeze yet, you're easy pickings."[34]

---

[32] *See* Federal Trade Commission, *Warning Signs of Identity Theft*, IDENTITYTHEFT.GOV https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last accessed Mar. 21, 2023).
[33] *See* Identity Theft Resource Center, *2021 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2021), https://www.idtheftcenter.org/identity-theft-aftermath-study/ (last accessed Mar. 21, 2023).
[34] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (August 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/ (last accessed Mar. 21, 2023).

75.     Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[35] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[36] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care." [37] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[38]

76.     A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

- Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

- Significant bills for medical goods and services neither sought nor received.

- Issues with insurance, co-pays, and insurance caps.

- Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

- Serious life consequences resulting from the crime; for example, victims have been

---

[35] Pam Dixon and John Emerson, *The Geography of Medical Identity Theft*, FTC.GOV (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf (last accessed Mar. 21, 2023).
[36] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk…*, *supra* n.25.
[37] *See What to Know About Medical Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Mar. 21, 2023).
[38] *Id.*

falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

• As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

• Phantom medical debt collection based on medical billing or other identity information.

• Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[39]

77. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[40]

78. It is within this context that Plaintiffs and Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by and in the possession of people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black-market.

***Damages Sustained by Plaintiffs and the Other Class Members***

79. Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs

---

[39] *See* Pam Dixon and John Emerson, *The Geography of Medical Identity Theft*, *supra* n.35.

[40] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf (last accessed Mar. 21, 2023).

associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; (vii) overpayment for the services that were received without adequate data security; and (viii) a loss of privacy from the unauthorized access and exfiltration of PII/PHI.

## CLASS ALLEGATIONS

80.    This action is brought and may be properly maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

81.    Plaintiffs bring this action on behalf of themselves and all members of the following class of similarly situated persons:

> All persons whose personally identifiable information or protected health information was compromised in the Data Breach by unauthorized persons, including all persons who were sent a notice of the Data Breach (the "Class").

82.    Plaintiffs Odell and Torres alternatively bring this action on behalf of themselves and all members of the following subclass of similarly situated persons:

> All persons who provided their PII/PHI to Nationwide Optometry, P.C. and whose PII/PHI was disclosed to unauthorized persons in the Data Breach, including all persons who provided their PII/PHI to Nationwide Optometry, P.C. and were sent a notice of the Data Breach (the "Subclass").[41]

83.    Excluded from the Class are U.S. Vision, Inc., USV Optical, Inc., Nationwide Optometry, P.C., and their affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

---

[41] Where appropriate, the Class and Subclass are collectively referred to as the "Class."

84. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

85. The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. Defendants reported to the United States Department of Health and Human Services Office of Civil Rights that approximately 711,072 persons' information was exposed in the Data Breach.

86. Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a. Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and Class members' PII/PHI from unauthorized access and disclosure;

b. Whether Defendants had duties not to disclose the PII/PHI of Plaintiffs and Class members to unauthorized third parties;

c. Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiffs' and Class members' PII/PHI;

d. Whether an implied contract existed between Class members and Defendants, providing that Defendants would implement and maintain reasonable security measures to protect and secure Class members' PII/PHI from unauthorized access and disclosure;

e. Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII/PHI of Plaintiffs and Class members;

    f.   Whether Defendants breached their duties to protect Plaintiffs' and Class members' PII/PHI; and

    g.   Whether Plaintiffs and Class members are entitled to damages and the measure of such damages and relief.

87.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

88.    Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all proposed members of the Class, had their PII/PHI compromised in the Data Breach. Plaintiffs and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

89.    Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs are adequate representatives of the Class in that they have no interests adverse to, or that conflict with, the Class they seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

90.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class

members to individually seek redress from Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

91.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

92.     This claim is brought by Plaintiffs individually and on behalf of both the Class and Subclass against U.S. Vision, Inc. and USV Optical, Inc., and is brought by Plaintiffs Odell and Torres individually and on behalf of the Subclass against Nationwide Optometry, P.C.

93.     Defendants owed a duty to Plaintiffs and Class members to exercise reasonable care in safeguarding, securing, and protecting the PII/PHI in their possession, custody, or control.

94.     Defendants knew or should have known the risks of collecting and storing Plaintiffs' and all other Class members' PII/PHI and the importance of maintaining secure systems. Defendants knew or should have known of the many data breaches that have targeted companies that stored PII/PHI in recent years.

95.     Given the nature of Defendants' business, the sensitivity and value of the PII/PHI they maintain, and the resources at their disposal, Defendants should have identified the vulnerabilities to their systems and prevented the Data Breach from occurring.

96.    On their websites, Defendants explicitly promise to follow industry standards and use reasonable methods to protect the PII/PHI in their control.

97.    Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to them—including Plaintiffs' and Class members' PII/PHI.

98.    Plaintiffs and Class members had no ability to protect their PII/PHI that was, or remains, in Defendants' possession.

99.    It was or should have been reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiffs' and Class members' PII/PHI to unauthorized individuals.

100.    But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiffs and Class members, their PII/PHI would not have been compromised. The PII/PHI of Plaintiffs and the Class was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding, securing, and protecting such PII/PHI by, *inter alia*, adopting, implementing, and maintaining appropriate security measures.

101.    As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and Class members

have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; (vii) overpayment for the services that were received without adequate data security; (viii) loss of privacy from the unauthorized access and exfiltration of PII/PHI; and (ix) diminished value of PII/PHI.

## COUNT II
## NEGLIGENCE PER SE

102.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

103.    This claim is brought by Plaintiffs individually and on behalf of both the Class and Subclass against U.S. Vision, Inc. and USV Optical, Inc., and is brought by Plaintiffs Odell and Torres individually and on behalf of the Subclass against Nationwide Optometry, P.C.

104.    Defendants' duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

105.    Defendants' duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as

interpreted by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to employ reasonable measures to protect and secure PII/PHI.

106.    Defendants violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiffs' and other Class members' PII/PHI and not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII/PHI they obtain and store, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiffs and the other Class members.

107.    Defendants' violation of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitutes negligence per se.

108.    Plaintiffs and Class members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

109.    The harm occurring as a result of the Data Breach is the type of harm HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiffs and Class members as a result of the Data Breach.

110.    It was or should have been reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and

hardware systems, would result in the release, disclosure, and dissemination of Plaintiffs' and Class members' PII/PHI to unauthorized individuals.

111.    The injury and harm that Plaintiffs and the other Class members suffered was the direct and proximate result of Defendants' violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; (vii) overpayment for the services that were received without adequate data security; (viii) loss of privacy from the unauthorized access and exfiltration of PII/PHI; and (ix) diminished value of PII/PHI.

## COUNT III
## BREACH OF FIDUCIARY DUTY

112.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

113.    This claim is brought by Plaintiffs individually and on behalf of both the Class and Subclass against U.S. Vision, Inc. and USV Optical, Inc., and is brought by Plaintiffs Odell and Torres individually and on behalf of the Subclass against Nationwide Optometry, P.C.

114.    As a condition of obtaining services from Defendants, Plaintiffs and Class members gave Defendants their PII/PHI in confidence, believing that Defendants would protect that

information. Plaintiffs and Class members would not have provided Defendants with this information had they known it would not be adequately protected. Defendants' acceptance and storage of Plaintiffs' and Class members' PII/PHI created a fiduciary relationship between Defendants and Plaintiffs and Class members. In light of this relationship, Defendants must act primarily for the benefit of their patients, which includes safeguarding and protecting Plaintiffs' and Class members' PII/PHI.

115.    Defendants have a fiduciary duty to act for the benefit of Plaintiffs and Class members upon matters within the scope of their relationship. They breached that duty by failing to properly protect the integrity of the system containing Plaintiffs' and Class members' PII/PHI, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiffs' and Class members' PII/PHI that they collected.

116.    As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; (vii) overpayment for the services that were received without adequate data security; (viii) loss of privacy from the unauthorized access and exfiltration of PII/PHI; and (ix) diminished value of PII/PHI.

## <u>COUNT IV</u>
## BREACH OF IMPLIED CONTRACT

117.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

118.    This claim is brought by Plaintiffs individually and on behalf of both the Class and Subclass against U.S. Vision, Inc. and USV Optical, Inc., and is brought by Plaintiffs Odell and Torres individually and on behalf of the Subclass against Nationwide Optometry, P.C.

119.    In connection with receiving health care services, Plaintiffs and all other Class members entered into implied contracts with Defendants.

120.    Pursuant to these implied contracts, Plaintiffs and Class members paid money to Defendants and provided Defendants with their PII/PHI. In exchange, Defendants agreed to, among other things, and Plaintiffs understood that Defendants would: (1) provide eyecare services to Plaintiffs and Class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiffs' and Class members' PII/PHI; and (3) protect Plaintiffs' and Class members' PII/PHI in compliance with federal and state laws and regulations and industry standards.

121.    The protection of PII/PHI was a material term of the implied contracts between Plaintiffs and Class members, on the one hand, and Defendants, on the other hand. Indeed, as set forth *supra*, Defendants recognized the importance of data security and the privacy of their patients' PII/PHI in their representations on their websites. Had Plaintiffs and Class members known that Defendants would not adequately protect their patients' and former patients' PII/PHI, they would not have paid for eyecare services from Defendants.

122.    Plaintiffs and Class members performed their obligations under the implied contract when they provided Defendants with their PII/PHI and paid for eyecare services from Defendants.

123.    Defendants breached their obligations under their implied contracts with Plaintiffs and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII/PHI, and in failing to implement and maintain security protocols and procedures to protect Plaintiffs' and Class members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

124.    Defendants' breach of their obligations of the implied contracts with Plaintiffs and Class members directly resulted in the Data Breach and the resulting injuries to Plaintiffs and Class members.

125.    Plaintiffs and all other Class members were damaged by Defendants' breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased and imminent risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) they lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) they overpaid for the services that were received without adequate data security.

## COUNT V
## UNJUST ENRICHMENT

126.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

127.     This claim is pleaded in the alternative to the breach of implied contract claim.

128.     This claim is brought by Plaintiffs individually and on behalf of both the Class and Subclass against U.S. Vision, Inc. and USV Optical, Inc., and is brought by Plaintiffs Odell and Torres individually and on behalf of the Subclass against Nationwide Optometry, P.C.

129.     In obtaining services from Defendants, Plaintiffs and Class members provided and entrusted their PII and PHI to Defendants.

130.     Plaintiffs and Class members conferred a monetary benefit upon Defendants in the form of monies paid for eyecare services.

131.     Defendants accepted or had knowledge of the benefits conferred upon them by Plaintiffs and Class members. Defendants also benefitted from the receipt of Plaintiffs' and Class members' PII/PHI, as this was used to facilitate billing and payment services.

132.     As a result of Defendants' conduct, Plaintiffs and Class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiffs and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

133.     Defendants should not be permitted to retain the money belonging to Plaintiffs and Class members because Defendants failed to adequately implement the data privacy and security procedures for themselves that Plaintiffs and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

134.    Defendants should be compelled to provide for the benefit of Plaintiffs and Class members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

### COUNT VI
### VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT
### A.R.S. §§ 44-1521 *et seq*. ("ACFA")

135.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

136.    This claim is brought by Plaintiff Torres and Plaintiff Odell individually and on behalf of both the Class and the Subclass against U.S. Vision, Inc. and USV Optical, Inc., and is brought by Plaintiffs Odell and Torres individually and on behalf of the Subclass against Nationwide Optometry, P.C.

137.    The ACFA states:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

A.R.S. § 44-1522(A).

138.    Plaintiffs, Class members, and Defendants are "persons" under the ACFA. A.R.S. § 44-1521(6).

139.    The services that Defendants provide are "merchandise" pursuant to the ACFA. A.R.S. § 44-1521(5).

140.    Defendants made uniform representations to Plaintiffs and Class Members that their PII/PHI will remain private, as evidenced by, *inter alia*, their privacy policies. Defendants

committed deceptive omissions in violation of the ACFA by failing to inform Plaintiffs and Class Members that Defendants would not adequately secure Plaintiffs' and Class Members' PII/PHI. Documents that should have contained such disclosures, but did not, include the privacy policies.

141.    Defendants separately engaged in unfair acts and practices in violation of the ACFA by failing to implement and maintain reasonable security measures to protect and secure Plaintiffs' and Class Members' PII/PHI in a manner that complied with applicable laws, regulations, and industry standards. The failure to implement and maintain reasonable data security measures offends established public policy, is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

142.    Due to the Data Breach, Plaintiffs and Class members have lost property in the form of their PII/PHI. Further, Defendants' failure to adopt reasonable practices in protecting and safeguarding their patients' PII/PHI will force Plaintiffs and Class members to spend time or money to protect against identity theft. Plaintiffs and Class members are now at a higher risk of medical identity theft and other crimes. This harm sufficiently outweighs any justifications or motives for Defendants' practice of collecting and storing PII/PHI without appropriate and reasonable safeguards to protect such information.

143.    Plaintiffs and all other Class members were damaged by Defendants' violation of the ACFA because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) they lost time

and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) they overpaid for the services that were received without adequate data security.

**COUNT VII**
**VIOLATIONS OF THE OKLAHOMA CONSUMER PROTECTION ACT**
**15 O.S. §§ 751 *et seq.* ("OCPA")**

144.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

145.    This claim is brought by Plaintiff Morgan individually and on behalf of the Class against U.S. Vision, Inc. and USV Optical, Inc.

146.    Plaintiff Morgan, U.S. Vision, and USV are "persons" under the OCPA. 15 O.S.§ 752(1).

147.    The eyecare services that U.S. Vision and USV provided to Plaintiff Morgan and Class members are a "consumer transaction" under the OCPA. 15 O.S. § 752(2).

148.    The OCPA lists 37 categories of practices that are considered unlawful under the statute. *See* 15 O.S. § 753. U.S. Vision and USV's conduct in representing that it would protect Plaintiff Morgan and Class members' PII/PHI, but not actually providing adequate protection, constitutes an unlawful practice in at least the following categories:

a.    "Represents, knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style, or model, if it is of another" 15 O.S. § 753(7);

b.    "Advertises, knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised" 15 O.S. § 753(8);

c.  "Commits an unfair or deceptive practice as defined in Section 752 of [the OCPA]" 15 O.S. § 753(20).

149.    Had Plaintiff Morgan and Class members been aware of the omitted and misrepresented facts, i.e., that U.S. Vision and USV would not adequately protect their PII/PHI, Plaintiff Morgan and the other Class members would not have provided their PII/PHI to U.S. Vision and USV.

150.    Pursuant to 15 O.S. § 761.1(A), Plaintiff Morgan seeks damages on behalf of herself and Class members. Because of the nature of U.S. Vision and USV's conduct, Plaintiff Morgan and Class members are entitled to up to three times the amount of actual damages.

151.    Plaintiff Morgan also seeks equitable relief, including an injunction, as the Court deems necessary and proper.

### COUNT VIII
### VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT
### N.J. Stat. §§ 56:8-1 *et seq*. ("NJCFA")

152.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

153.    This claim is brought by Plaintiffs individually and on behalf of both the Class and Subclass against U.S. Vision, Inc. and USV Optical, Inc., and is brought by Plaintiffs Odell and Torres individually and on behalf of the Subclass against Nationwide Optometry, P.C.

154.    The NJCFA states:

The act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J. Stat. § 56:8-2.

155.    Plaintiffs, Class members, and Defendants are "persons" under the NJCFA. N.J. Stat. § 56:8-1(d).

156.    The services that Defendants provided are "merchandise" pursuant to the NJCFA. N.J. Stat. § 56:8-1(c).

157.    Defendants made uniform representations to Plaintiffs and Class members that their PII/PHI will remain private, as evidenced by, *inter alia*, their privacy policies. Defendants committed deceptive omissions in violation of the NJCFA by failing to inform Plaintiffs and Class members that Defendants would not adequately secure Plaintiffs' and Class members' PII/PHI. Documents that should have contained such disclosures, but did not, include the privacy policies.

158.    Defendants separately engaged in unfair acts and practices in violation of the NJCFA by failing to implement and maintain reasonable security measures to protect and secure Plaintiffs' and Class members' PII/PHI in a manner that complied with applicable laws, regulations, and industry standards. The failure to implement and maintain reasonable data security measures offends established public policy, is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

159.    Due to the Data Breach, Plaintiffs and Class members have lost property in the form of their PII/PHI. Further, Defendants' failure to adopt reasonable practices in protecting and safeguarding their patients' PII/PHI will force Plaintiffs and Class members to spend time or money to protect against identity theft. Plaintiffs and Class members are now at a higher risk of medical identity theft and other crimes. This harm sufficiently outweighs any justifications or motives for Defendants' practice of collecting and storing PII/PHI without appropriate and reasonable safeguards to protect such information.

160.    Plaintiffs and all other Class members were damaged by Defendants' violation of the NJCFA because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) they lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) they overpaid for the services that were received without adequate data security.

### PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all other members of the Class, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A.    Certifying the Class as requested herein, designating Plaintiffs as Class representatives, and appointing Ben Barnow, Jean S. Martin, and Terence R. Coates as Class Counsel;

B.    Awarding Plaintiffs and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.    Awarding Plaintiffs and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, on behalf of themselves and the Class, seek appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit

monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.    Awarding Plaintiffs and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.    Awarding Plaintiffs and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.    Awarding Plaintiffs and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

Dated: March 23, 2023                          Respectfully submitted,

*/s/ Janine Pollack*
Janine Pollack
**CALCATERRA POLLACK LLP**
1140 Avenue of the Americas, 9th Floor
New York, New York 10036
Phone: (212) 899-1760
Fax: (332) 206-2073
Email: jpollack@calcaterrapollack.com

*Local Counsel*

Ben Barnow*
Anthony L. Parkhill*
Riley W. Prince***
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Ste. 1630
Chicago, IL 60606
Tel: 312-621-2000
Fax: 312-641-5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com
rprince@barnowlaw.com

Terence R. Coates*
Justin C. Walker**
**MARKOVITS, STOCK & DEMARCO, LLC**
119 E. Court Street, Suite 530
Cincinnati, OH 45202
Phone: (513) 651-3700
Fax: (513) 665-0219
tcoates@msdlegal.com
jwalker@msdlegal.com

Jean S. Martin*
Francesca Kester***
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 559-4908
jeanmartin@ForThePeople.com
fkester@ForThePeople.com

*Interim Co-Lead Counsel*

Gary M. Klinger***
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Phone: (312) 224-8488
gklinger@milberg.com

Victoria Maniatis
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
100 Garden City Plaza, Suite 500
Garden City, New York 11530
Tel.: (212) 594-5300
vmaniatis@milberg.com

*Additional Plaintiffs' Counsel*

*\*admitted pro hac vice forthcoming*
*\*\* pro hac vice pending*
*\*\*\*pro hac vice forthcoming*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above document was served upon all counsel of record via ECF electronic filing on March 23, 2023.


/s/ *Janine Pollack*
Janine Pollack