**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE U.S. VISION DATA BREACH LITIGATION | Case No. 22-cv-06558 |
| | **CLASS ACTION** |
| This Document Relates To: All Matters | **JURY TRIAL DEMANDED** |

<u>**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**</u>

Plaintiffs Ian Torres, Bonita Odell, and Lacie Morgan ("Plaintiffs"), individually, and on behalf of all others similarly situated ("Class members"), by and through their attorneys, bring this Amended Consolidated Class Action Complaint against Defendants U.S. Vision, Inc. ("U.S. Vision"), USV Optical, Inc. ("USV") (together with U.S. Vision, the "USV Defendants"), and Nationwide Optometry, P.C. ("Nationwide") (collectively "Defendants"), and complain and allege upon personal knowledge as to themselves and information and belief as to all other matters.

<u>**INTRODUCTION**</u>

1.      Plaintiffs bring this class action against Defendants for their failure to secure and safeguard their and approximately 711,072 other individuals' personally identifying information ("PII") and protected health information ("PHI"), including names, dates of birth, addresses, Social Security numbers, taxpayer identification numbers, driver's license or state identification numbers, financial account information, medical and/or treatment information, health insurance information, billing and claims information, biometric data, email addresses, usernames, and passwords.

2.      U.S. Vision is a company that provides eyecare services and sells eyecare products. USV is a subsidiary of U.S. Vision that, upon information and belief, stores and controls patient data on behalf of U.S. Vision.

3.      Nationwide Optometry, P.C. ("Nationwide") is an eyecare service provider and

former wholly owned subsidiary of U.S. Vision.

4.      Between April 20, 2021 and May 17, 2021, an unauthorized individual, or unauthorized individuals, gained access to the USV Defendants' network systems and accessed and acquired files from the system that contained the PII/PHI of Plaintiffs and Class members (the "Data Breach").

5.      In the regular course of their business operations, Defendants acquired, collected, utilized, and derived a benefit from Plaintiffs and Class members' PII/PHI. Therefore, Defendants owed and otherwise assumed legal and ethical duties and obligations, including to keep Plaintiffs and Class members' PII/PHI confidential, safe, secure, and protected from the type of unauthorized access, disclosure, and theft that occurred in the Data Breach.

6.      Defendants owed a duty to Plaintiffs and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. Defendants breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect their patients' PII/PHI from unauthorized access and disclosure.

7.      As a result of Defendants' inadequate security and breach of their duties and obligations, the Data Breach occurred, and Plaintiffs' and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiffs bring this action on behalf of themselves and all persons whose PII/PHI was exposed as a result of the Data Breach, which U.S. Vision says it learned of on or about May 12, 2021.

8.      Plaintiffs, on behalf of themselves and all other Class members, assert claims for negligence, negligence per se, breach of fiduciary duty, breach of implied contract, breach of contract (third-party beneficiary), unjust enrichment, violations of the Arizona Consumer Fraud

Act, and violations of the New Jersey Consumer Fraud Act, and seek declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

### *Plaintiff Ian Torres*

9.      Plaintiff Ian Torres is an Arizona resident.

10.     Plaintiff Torres previously obtained eyecare services from Nationwide, including during the period of time in which Nationwide acted as an alter ego of U.S. Vision. For example, Plaintiff Torres filled multiple prescriptions through Nationwide in 2018.

11.     Plaintiff Torres received a letter from Nationwide dated October 28, 2022, which notified him that his PII/PHI was accessed in the Data Breach.

12.     Plaintiff Torres would not have sought services from or provided his PII/PHI to Defendants had he known that his information would not be adequately safeguarded by Defendants.

13.     Plaintiff Torres stores any documents containing PII/PHI in a safe and secure location. Plaintiff Torres does not knowingly transmit unencrypted PII/PHI over the internet. Plaintiff Torres also uses unique complex passwords and/or two factor authentication for online accounts storing sensitive PII/PHI.

14.     Plaintiff Torres experienced actual identify theft and fraud, which he discovered after receiving a letter from the U.S. Internal Revenue Service (the "IRS Letter"), dated September 29, 2022, explaining that an unauthorized person attempted to impersonate Plaintiff Torres by using his name and taxpayer ID number to file a false tax return. The IRS Letter stated that Plaintiff Torres may be the victim of identity theft.

15.     As a result of the attempted fraud on Plaintiff Torres' tax return, the IRS placed an identity theft indicator on Plaintiff Torres' taxpayer identification number that will be reviewed by the IRS on all future tax returns filed by Plaintiff Torres. Plaintiff Torres must also use an identity protection personal ID number ("ID PIN") on all future tax returns for the remainder of his life. This unique ID PIN changes each December or January. As a result, Plaintiff Torres must continually acquire and enter a new ID PIN for every tax return he files for the remainder of his life.

16.     Plaintiff Torres is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII/PHI, in combination with his name, being placed in the hands of unauthorized third parties/criminals. This injury was worsened by Defendants' 17-month long delay in informing Plaintiffs and Class members about the Data Breach.

17.     Plaintiff Torres was forced to spend several hours attempting to resolve issues related to the Data Breach and the resulting tax fraud that he suffered. This includes, but is not limited to, at least 4 hours attempting to reach and then speaking with the IRS, and several hours reviewing financial account statements and medical records for indications of actual or attempted identity theft or fraud.

18.     Plaintiff Torres has a continuing interest in ensuring that his PII/PHI, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

19.     As a direct result of the Data Breach, Plaintiff Torres has suffered injury by the loss of privacy due to having his PII/PHI accessed and exfiltrated without his consent.

20.     As a direct result of the Data Breach, Plaintiff Torres has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity

theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII/PHI; deprivation of the value of his PII/PHI; and overpayment for services that did not include adequate data security.

***Plaintiff Bonita Odell***

21.    Plaintiff Bonita Odell is an Arizona resident.

22.    Plaintiff Odell obtained eyecare services from Nationwide, including during the period of time in which Nationwide acted as an alter ego of U.S. Vision. Plaintiff Odell first received eyecare services from Nationwide on June 14, 2018.

23.    Plaintiff Odell received a letter from Nationwide in or about October of 2022, which notified her that her PII/PHI was accessed in the Data Breach.

24.    Plaintiff Odell would not have sought services from or provided her PII/PHI to Nationwide had she known that her information would not be adequately safeguarded by Defendants.

25.    As a result of the Data Breach, Plaintiff Odell has suffered a dramatic increase in the number of spam telephone calls she receives. Since the Data Breach, these spam calls have become a constant source of frustration for her and her family.

26.    Plaintiff Odell is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from her PII/PHI, in combination with her name, being placed in the hands of unauthorized third parties/criminals. This injury was worsened by Defendants' 17-month long delay in informing Plaintiffs and Class members about the Data Breach.

27.    Plaintiff Odell has a continuing interest in ensuring that her PII/ PHI, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

28.    As a direct result of the Data Breach, Plaintiff Odell has suffered injury by the loss of privacy due to having her PII/PHI accessed and exfiltrated without her consent.

29.    As a direct result of the Data Breach, Plaintiff Odell has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PHI; deprivation of the value of her PII/PHI; and overpayment for services that did not include adequate data security.

***Plaintiff Lacie Morgan***

30.    Plaintiff Lacie Morgan is an Oklahoma resident.

31.    Plaintiff Morgan received eye care services from Nationwide.

32.    On or about November 5, 2022, Plaintiff Morgan received a letter from Nationwide, dated October 28, 2022, notifying her that her PII/PHI had been improperly accessed and/or obtained by unauthorized third parties in the Data Breach.

33.    Plaintiff Morgan would not have sought services from or provided her PII/PHI to Nationwide had she known that her information would not be adequately safeguarded by Defendants.

34.    Shortly after and as a result of the Data Breach, Plaintiff Morgan discovered numerous unauthorized charges totaling approximately $2,000 on her bank account statements. As a result of these unauthorized charges and the Data Breach in general, Plaintiff Morgan experienced the following damages: assessed $250-$300 in fees; her credit score being lowered causing her to be unable to obtain a home loan; being unable to pay her daughter's medical bills and having to seek financial assistance and obtain two loans; being unable to pay her credit card

bills; and having to cancel her debit card and, thus, lose access to her funds while she awaited the arrival of her new card.

35.    Shortly after and as a result of the Data Breach, Plaintiff Morgan suffered from identity theft in 2021. Specifically, numerous subscriptions were opened in her name and charged to her bank account.

36.    Shortly after and as a result of the Data Breach, Plaintiff Morgan experienced an increase in spam and suspicious phone calls, texts, and emails.

37.    As a result of these unauthorized charges, identity theft, impacted credit score, and the Data Breach in general, Plaintiff Morgan was unable to obtain financing for a car in 2021.

38.    Plaintiff Morgan has spent more than 40 hours responding to and dealing with the effects of the Data Breach and will continue to spend valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation.

39.    Plaintiff Morgan is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from her PII/PHI, in combination with her name, being placed in the hands of unauthorized third parties/criminals. This injury was worsened by Defendants' 17-month long delay in informing Plaintiffs and Class members about the Data Breach.

40.    Plaintiff Morgan has a continuing interest in ensuring that her PII/PHI, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

41.    As a direct result of the Data Breach, Plaintiff Morgan has suffered injury by the loss of privacy due to having her PII/PHI accessed and exfiltrated without her consent.

As a direct result of the Data Breach, Plaintiff Morgan has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful

disclosure and loss of confidentiality of her highly sensitive PII/PHI; deprivation of the value of her PII/PHI; and overpayment for services that did not include adequate data security.

*Defendants*

42.     Defendant U.S. Vision, Inc. is a Delaware corporation with its principal place of business in Blackwood, New Jersey. U.S. Vision's headquarters are located at 1 Harmon Drive, Blackwood, New Jersey 08012. U.S. Vision may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

43.     Defendant USV Optical, Inc. is a Texas corporation with its principal place of business in Blackwood, New Jersey. USV's headquarters are located at 1 Harmon Drive, Blackwood, New Jersey 08012. USV may be served through its registered agent: Corporation Service Company, d/b/a CSC Lawyers Incorporated, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

44.     Defendant Nationwide Optometry, P.C. is a professional corporation formed in Arizona. Nationwide's principal place of business is 220 North McKemy Avenue, Chandler, Arizona 85226. Nationwide may be served through its registered agent: C T Corporation System, 38900 North Central Avenue, Suite 460, Phoenix, Arizona 85012.

## JURISDICTION AND VENUE

45.     The Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from the citizenship of all of Defendants' members, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

46.     This Court has personal jurisdiction over U.S. Vision, Inc. and USV Optical, Inc. because U.S. Vision, Inc. and USV Optical, Inc. have their principal place of business in New Jersey.

47.     This Court has personal jurisdiction over Nationwide Optometry, P.C. because Nationwide contracted with U.S. Vision, which has its principal place of business in New Jersey, and shared Plaintiffs' PII/PHI with U.S. Vision in New Jersey.

48.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because U.S. Vision, Inc. and USV Optical, Inc.'s principal place of business is in New Jersey; Nationwide Optometry P.C. does business with U.S. Vision, Inc. in this District; and a significant amount of the events leading to Plaintiffs' causes of action occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of Defendants*

49.     U.S. Vision "is a retailer of optical products and services."[1] U.S. Vision "provide[s] a wide variety of services including comprehensive eye exams, contact lens fittings, and [prescription] updates."[2] In the regular course of its business, U.S. Vision collects and maintains the PII/PHI of its patients and its affiliates' patients.

50.     USV is a subsidiary of U.S. Vision.[3]

51.     Nationwide is a professional corporation formed in Arizona.

---

[1] *Homepage*, U.S. VISION, https://www.usvision.com/ (last accessed June 18, 2024).
[2] *About U.S. Vision*, U.S. VISION, https://www.usvision.com/about-us/ (last accessed June 18, 2024).
[3] *See* Notice of Data Security Incident, NATIONWIDE, https://response.idx.us/incident-information/ (last accessed June 18, 2024).

52.     In 2013, U.S. Vision acquired Nationwide, which at the time was the largest optometry provider in the State of Arizona.[4]

53.     Nationwide "provides complete eye care services," including care relating to "routine exams, glasses, [and] contact lenses."[5] Nationwide also provides services for cataracts, glaucoma, macular degeneration, and pterygium treatment.[6]

54.     Nationwide, which was a wholly owned subsidiary, acted as an alter ego of U.S. Vision until September 2019 when it was sold to EyeCare Partners, LLC.

55.     The affairs of Nationwide and U.S. Vision were co-mingled, including overlap in officers. From April 15, 2016 until at least June 28, 2019, Nationwide's Treasurer was Jennifer Andrews. During her time as Nationwide's Treasurer, Ms. Andrews also served as a Senior Vice President of Finance for U.S. Vision (March 2015–March 2017), and then as an Executive Vice President of Finance for U.S. Vision (March 2017–November 2019).

56.     Upon information and belief, during the time that Nationwide was a subsidiary of U.S. Vision, the Defendants shared a computer system, which stored the PII/PHI of the patients of U.S. Vision companies, including Nationwide.

57.     U.S. Vision boasts that "U.S. Vision, Inc. [] respects your privacy and are committed to protecting it . . . ."[7] U.S. Vision also declares that "We apply technical, administrative and organizational security measures to protect the data we collect against accidental or unlawful

---

[4] *Refac and its U.S. Vision Subsidiary to Acquire Nationwide Vision*, Vision Monday (Sep. 10, 2013 4:15 pm), https://www.visionmonday.com/article/refac-and-its-us-vision-subsidiary-to-acquire-nationwide-vision-1/.

[5] *Nationwide Vision Eye Care Services in Arizona*, Nationwide Vision, https://www.nationwidevision.com/eye-care-services (last accessed June 18, 2024).

[6] *See id.*

[7] *Privacy Policy*, U.S. Vision, https://www.usvision.com/privacy-policy/ (last accessed June 18, 2024).

destruction and loss, alteration, unauthorized disclosure or access, in particular, where the processing involves the transmission of data over a network and against other unlawful forms of processing."[8]

58.    Nationwide's website contains a privacy policy which states, "[Nationwide] takes the privacy of its users' . . . information very seriously."[9] The policy goes on to state that Nationwide will not share its patients' personal information except in enumerated circumstances.[10] The policy also states, "We are required by applicable law to maintain the privacy of your health information."[11] The policy further states, "We follow generally accepted industry standards to protect the personal information submitted to us, and to protect against loss, misuse or alteration of your information."[12]

59.    Following the sale of Nationwide in September 2019, U.S. Vision and USV, now operating at arm's length through a contract, continued to provide certain medical practice management and other administrative services for Nationwide, including data storage and management. To utilize those services, Nationwide continued to provide U.S. Vision and USV with the PII/PHI of Nationwide's patients and customers. U.S. Vision and USV then collected, stored, and maintained the PII/PHI of Nationwide's patients and customers.

60.    U.S. Vision continuously maintained the PII/PHI of Nationwide's patients, including Plaintiffs, both before and after the 2019 corporate sale.

---

[8] *Id.*

[9] *Privacy Policy*, Nationwide Vision, https://www.nationwidevision.com/privacy-policy (last accessed June 18, 2024).

[10] *See id.*

[11] *Id.*

[12] *Id.*

61.    Plaintiffs and Class members are (or were) patients of Defendants or Defendants' affiliates.

62.    Because of the highly sensitive and personal nature of the information Defendants acquired and stored with respect to patients, Defendants, upon information and belief, promise to, among other things: keep patients' PII/PHI private; comply with healthcare industry standards related to data security; inform patients of legal duties and comply with all federal and state laws protecting patients' PII/PHI; only use and release patients' PII/PHI for reasons that relate to medical care and treatment; and provide adequate notice to customers if their PII/PHI is disclosed without authorization.

### *Defendants are HIPAA Covered Entities*

63.    Defendants are HIPAA covered entities that provide healthcare related services. As a regular and necessary part of their business, Defendants collect and custody the highly sensitive PII/PHI of patients. Defendants are required under federal and state law to maintain the strictest confidentiality of the patient's PII/PHI that it requires, receives, and collects, and Defendants are further required to maintain sufficient safeguards to protect that private information from being accessed by unauthorized third parties.

64.    As HIPAA covered entities, Defendants are required to ensure that they will implement adequate safeguards to prevent unauthorized use or disclosure of PII/PHI including by implementing requirements of the HIPAA Security Rule and to report any unauthorized use or disclosure of PII/PHI, including incidents that constitute breaches of unsecured protected health information as in the case of the Data Breach complained of herein.

65.     Due to the nature of Defendants' businesses, which include facilitating eyecare services, Defendants would be unable to engage in their regular business activities without collecting and aggregating PII/PHI that it knows and understands to be sensitive and confidential.

66.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs and Class members' PII/PHI, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting that information from unauthorized disclosure.

67.     Plaintiffs and the Class members relied on Defendants to implement and follow adequate data security policies and protocols, to keep their PII/PHI confidential and securely maintained, to use such PII/PHI solely for business and health care purposes, and to prevent the unauthorized disclosures of the PII/PHI. Plaintiffs and Class members reasonably expected that Defendants would safeguard their highly sensitive information and keep their PII/PHI confidential.

68.     As described throughout this Complaint, Defendants did not reasonably protect, secure, or store Plaintiffs' and the Class's PII/PHI prior to, during, or after the Data Breach. Consequently, Defendants allowed for the unauthorized access and disclosure of Plaintiffs' and Class members' PII/PHI.

***The Data Breach***

69.     Between April 20, 2021 and May 17, 2021, an unauthorized individual, or unauthorized individuals, gained access to U.S. Vision's network systems and accessed and acquired certain files on U.S. Vision's computer systems.

70.     The Data Breach impacted current and former patients of U.S. Vision, Nationwide, as well as Sightcare, Inc., an Arizona eyecare provider.[13]

71.     U.S. Vision notified Nationwide about the Data Breach on May 12, 2021. The notice

---

[13] *See Notice of Data Security Incident*, *supra* n.3.

that Nationwide posted to its website states that the information that the cybercriminal had access to includes the following PII/PHI:

> (1) identifying information (such as full name, date of birth, and address); (2) Social Security number, taxpayer identification number, driver's license or state identification number, and/or financial account information; (3) medical and/or treatment information (such as medical record number, dates of service, provider name, diagnosis or symptom information, and prescription/medication); (4) health insurance information (such as payor and subscriber/Medicare/Medicaid number); and (5) billing and claims information . . . . For a limited number of individuals, biometric data and/or email address or username and password were also included in the affected data.[14]

72.     Defendants' notice states that their investigation into the Data Breach revealed that "files containing [patients'] information may have been viewed and/or taken by the unauthorized individual."[15]

### *Defendants Knew that Criminals Target PII/PHI*

73.     At all relevant times, Defendants knew, or should have known, that the PII/PHI that they collected was a target for malicious actors. Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiffs' and Class members' PII/PHI from cyber-attacks that Defendants should have anticipated and guarded against.

74.     It is well known amongst companies that store sensitive personally identifying information that sensitive information—such as the Social Security numbers ("SSNs") and medical information stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of

---

[14] *Id.*
[15] *Id.*

businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[16]

75.     Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2024 report, the healthcare compliance company Protenus found that there were 1,161 medical data breaches in 2023 with over 171 million patient records exposed.[17] This is an increase from the 1,138 medical data breaches which exposed approximately 59 million records that Protenus compiled in 2023.[18]

76.     PII/PHI is a valuable property right.[19] The value of PII/PHI as a commodity is measurable.[20] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[21] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[22] It is so valuable to identity thieves that once PII/PHI has

---

[16] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 A.M.), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[17] *See 2024 Breach Barometer*, PROTENUS 2, https://protenus.com/hubfs/Breach_Barometer/Latest%20Version/Protenus%20-%20Industry%20Report%20-%20Privacy%20-%20Breach%20Barometer%20-%202024.pdf (last accessed June 18, 2024).

[18] *See id*.

[19] *See* Marc van Lieshout, *The Value of Personal Data*, 457 INT'L FED'N FOR INFO. PROCESSING 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[20] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[21] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD LIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[22] *See* IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.COM (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

77.     As a result of the real and significant value of this material, identity thieves and other cyber criminals have openly posted credit card numbers, SSNs, PII/PHI, and other sensitive information directly on various Internet websites making the information publicly available. This information from various data breaches, including the information exposed in the Data Breach, can be readily aggregated and become more valuable to thieves and more damaging to victims.

78.     PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[23] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[24]

79.     All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[25] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[26]

---

[23] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAGAZINE (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon ("*What Happens to Stolen Healthcare Data*") (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[24] *Id.*

[25] *See* Adam Greenberg, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[26] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

80.     Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[27] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[28]

81.     Consumers place a high value on the privacy of that data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[29]

82.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

### Theft of PII/PHI Has Grave and Lasting Consequences for Victims

83.     Theft of PII/PHI is serious. The FTC warns consumers that identity thieves use PII/PHI to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[30]

---

[27] *What Happens to Stolen Healthcare Data*, *supra* n.25.
[28] *Id.*
[29] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.
[30] *See* Federal Trade Commission, *What to Know About Identity Theft*, FED. TRADE COMM'N CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed June 18, 2024).

84.     Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[31] According to Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[32]

85.     With access to an individual's PII/PHI, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture; using the victim's name and SSN to obtain government benefits; or, filing a fraudulent tax return using the victim's information. In addition, identity thieves may even give the victim's personal information to police during an arrest.[33]

86.     Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month

---

[31] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[32] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[33] *See* Federal Trade Commission, *Warning Signs of Identity Theft*, IDENTITYTHEFT.GOV https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last accessed June 18, 2024).

to resolve issues stemming from identity theft.[34]

87.    Theft of SSNs also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, breach victims have to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the harm has already been suffered by victims.

88.    Due to the highly sensitive nature of SSNs, theft of SSNs in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you don't have a credit freeze yet, you're easy pickings."[35]

89.    Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[36] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[37] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other

---

[34] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed June 18, 2024).
[35] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (August 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.
[36] Pam Dixon and John Emerson, *The Geography of Medical Identity Theft*, FTC.GOV (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.
[37] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk…*, *supra* n.28.

medical care." [38] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[39]

90.    A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

- Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

- Significant bills for medical goods and services neither sought nor received.

- Issues with insurance, co-pays, and insurance caps.

- Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

- Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

- As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

- Phantom medical debt collection based on medical billing or other identity information.

- Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[40]

---

[38] *See What to Know About Medical Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed June 18, 2024).
[39] *Id.*
[40] *See* Pam Dixon and John Emerson, *The Geography of Medical Identity Theft*, *supra* n.39.

91.     There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[41]

92.     It is within this context that Plaintiffs and Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by and in the possession of people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black-market.

### *Damages Sustained by Plaintiffs and the Other Class Members*

93.     Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; (vii) overpayment for the services that were received without adequate data security; and (viii) a loss of privacy from the unauthorized access and exfiltration of PII/PHI.

---

[41] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

## CLASS ALLEGATIONS

94.     This action is brought and may be properly maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

95.     Plaintiffs bring this action on behalf of themselves and all members of the following classes of similarly situated persons:

**U.S. Class**:

All persons whose personally identifiable information or protected health information was compromised in the Data Breach by unauthorized persons, including all persons who were sent a notice of the Data Breach (the "U.S. Class").

**Nationwide Subclass:**

All persons who provided their personally identifiable information or protected health information to Nationwide Optometry, P.C. and whose personally identifiable information or protected health information was disclosed to unauthorized persons in the Data Breach, including all persons who provided their personally identifiable information or protected health information to Nationwide Optometry, P.C. and were sent a notice of the Data Breach (the "Nationwide Subclass").

**Arizona Subclass:**

All Arizona residents whose personally identifiable information or protected health information was compromised in the Data Breach by unauthorized persons, including all Arizona residents who were sent a notice of the Data Breach (the "Arizona Subclass").

**Direct Subclass**

All persons who provided their personally identifiable information or protected health information to U.S. Vision (or one of its alter egos) and whose personally identifiable information or protected health information was disclosed to unauthorized persons in the Data Breach, including all persons who provided their personally identifiable information or protected health information to Nationwide Optometry, P.C. while it was a wholly owned subsidiary of U.S. Vision and were sent a notice of the Data Breach (the "Direct Subclass").

**Arizona Nationwide Subclass:**

All Arizona residents who provided their personally identifiable information or protected health information to Nationwide Optometry, P.C. and whose personally identifiable information or protected health information was disclosed to unauthorized persons in the Data Breach, including all Arizona residents who provided their personally identifiable information or protected health information to Nationwide Optometry, P.C. and were sent a notice of the Data Breach (the "Arizona Nationwide Subclass").

96.   Where appropriate, the U.S. Class and Subclasses are collectively referred to as the "Class."

97.   Excluded from the Class are Defendants and their affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

98.   Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

99.   The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. Defendants reported to the United States Department of Health and Human Services Office of Civil Rights that approximately 711,072 persons' information was exposed in the Data Breach.

100.   Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a.   Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and Class members' PII/PHI from unauthorized access and disclosure;

b.  Whether Defendants had duties not to disclose the PII/PHI of Plaintiffs and Class members to unauthorized third parties;

c.  Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiffs' and Class members' PII/PHI;

d.  Whether an implied contract existed between Class members and Defendants, providing that Defendants would implement and maintain reasonable security measures to protect and secure Class members' PII/PHI from unauthorized access and disclosure;

e.  Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII/PHI of Plaintiffs and Class members;

f.  Whether Defendants breached their duties to protect Plaintiffs' and Class members' PII/PHI; and

g.  Whether Plaintiffs and Class members are entitled to damages and the measure of such damages and relief.

101.  Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

102.  Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all proposed members of the Class, had their PII/PHI compromised in the Data Breach. Plaintiffs and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

103.    Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs are adequate representatives of the Class in that they have no interests adverse to, or that conflict with, the Class they seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

104.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(On Behalf of Plaintiffs and the U.S. Class Against Defendants U.S. Vision and USV)**

105.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

106.    This claim is brought by Plaintiffs individually and on behalf of the U.S. Class against U.S. Vision, Inc. and USV Optical, Inc.

107.    Defendants U.S. Vision and USV derived a substantial economic benefit from collecting and storing the PII/PHI of Plaintiffs and Class members. Without the submission of this PII/PHI, U.S. Vision and USV could not perform the services they provide.

108.    By obtaining, collecting, and storing, the PII/PHI of Plaintiffs and Class members, and using it for commercial gain, U.S. Vision and USV assumed legal and equitable duties and knew or should have known that they were responsible for protecting this PII/PHI from unauthorized disclosure.

109.    Defendants U.S. Vision and USV owed a duty to Plaintiffs and Class members to exercise reasonable care in safeguarding, securing, and protecting the PII/PHI in their possession, custody, or control.

110.    By collecting and storing this data in its computer system and network, U.S. Vision and USV owed a duty of care to use reasonable means to prevent disclosure of patient PII/PHI, and to safeguard the information from theft. U.S. Vision and USV's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

111.    Under HIPAA, the USV Defendants had a special relationship with Plaintiffs and Class members who entrusted the USV Defendants to adequately safeguard their PII/PHI.

112.    The USV Defendants' duty to use reasonable care in protecting PHI arises a result of the parties' relationship, as well as common law and federal law, including the HIPAA regulations described above, and Defendants U.S. Vision and USV's own policies and promises regarding privacy and data security.

113.    The USV Defendants knew or should have known the risks of collecting and storing Plaintiffs' and all other Class members' PII/PHI and the importance of maintaining secure systems.

Defendants knew or should have known of the many data breaches that have targeted companies that stored PII/PHI in recent years.

114.    Given the nature of the USV Defendants' business, the sensitivity and value of the PII/PHI they maintain, and the resources at their disposal, they should have identified the vulnerabilities to their systems and prevented the Data Breach from occurring.

115.    On their websites, U.S. Vision and USV explicitly promise to follow industry standards and use reasonable methods to protect the PII/PHI in their control.

116.    U.S. Vision and USV breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to them—including Plaintiffs' and Class members' PII/PHI.

117.    Plaintiffs and Class members had no ability to protect their PII/PHI that was, or remains, in U.S. Vision's and USV's  possession.

118.    It was or should have been reasonably foreseeable to U.S. Vision and USV that their failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiffs' and Class members' PII/PHI to unauthorized individuals.

119.    But for U.S. Vision and USV's negligent conduct or breach of the above-described duties owed to Plaintiffs and Class members, their PII/PHI would not have been compromised.

The PII/PHI of Plaintiffs and the Class was lost and accessed as the proximate result of U.S. Vision and USV's failure to exercise reasonable care in safeguarding, securing, and protecting such PII/PHI by, *inter alia*, adopting, implementing, and maintaining appropriate security measures.

120.    As a result of U.S. Vision and USV's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; (vii) overpayment for the services that were received without adequate data security; (viii) loss of privacy from the unauthorized access and exfiltration of PII/PHI; and (ix) diminished value of PII/PHI.

## <u>COUNT II</u>
## <u>NEGLIGENCE</u>
**(On Behalf of Plaintiffs and the Nationwide Subclass Against Defendant Nationwide)**

121.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

122.    This claim is brought by Plaintiffs individually and on behalf of the Nationwide Subclass against Nationwide Optometry, P.C.

123.    Nationwide owed a duty to Plaintiffs and Nationwide Subclass members to exercise reasonable care in safeguarding, securing, and protecting the PII/PHI in their possession, custody, or control, to include safeguarding the PII/PHI it shared with others in the course of its business.

124.    Nationwide knew or should have known the risks of collecting and storing Plaintiffs' and all other Nationwide Subclass members' PII/PHI and the importance of ensuring it was being housed on secure systems. Nationwide knew or should have known of the many data breaches that have targeted companies that stored PII/PHI in recent years.

125.    Given the nature of Nationwide's business, the sensitivity and value of the PII/PHI they collect, and the resources at their disposal, Nationwide should have fully vetted and tested any companies it shared patient information with, including U.S. Vision and USV. However, regardless of Nationwide's own negligence, it is also liable for the negligence of U.S. Vision and USV, which were acting as Nationwide's agents at the time of the Data Breach.

126.    On its website, Nationwide explicitly promises to follow industry standards and use reasonable methods to protect the PII/PHI in its control.

127.    Nationwide breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Nationwide Subclass members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to them—including Plaintiffs' and Nationwide Subclass members' PII/PHI.

128.    Plaintiffs and Nationwide Subclass members had no ability to protect their PII/PHI that was, or remains, in Nationwide's possession.

129.    It was or should have been reasonably foreseeable to Nationwide that its failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Nationwide Subclass members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiffs' and Nationwide Subclass members' PII/PHI to unauthorized individuals.

130.    But for Nationwide's negligent conduct or breach of the above-described duties owed to Plaintiffs and Nationwide Subclass members, their PII/PHI would not have been compromised. The PII/PHI of Plaintiffs and the Class was lost and accessed as the proximate result of Nationwide's failure to exercise reasonable care in safeguarding, securing, and protecting such PII/PHI by, *inter alia*, adopting, implementing, and maintaining appropriate security measures.

131.    As a result of Nationwide's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and Nationwide Subclass members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; (vii) overpayment for the services that were received

without adequate data security; (viii) loss of privacy from the unauthorized access and exfiltration of PII/PHI; and (ix) diminished value of PII/PHI.

**COUNT III**
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiffs and the U.S. Class Against Defendants U.S. Vision and USV)**

132.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

133.    This claim is brought by Plaintiffs individually and on behalf of the U.S. Class against U.S. Vision, Inc. and USV Optical, Inc.

134.    U.S. Vision's and USV's duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

135.    U.S. Vision and USV are obligated under HIPAA to, among other things, "ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits" and "protect against any reasonably anticipated threats or hazards to the security or integrity of such information." 45 C.F.R. § 164.306.

136.    Mandatory standards that all covered entities must adhere to are set forth in 45 C.F.R. Sections 164.308 (Administrative safeguards), 164.310 (Physical safeguards), 164.312 (Technical safeguards), 164.314 (Organizational requirements), and 164.316 (Policies and procedures and documentation requirements).

137.    U.S. Vision and USV violated HIPAA by failing to adhere to and meet the required standards as set forth in 45 C.F.R. §§ 164.308, 164.310, 164.312, 164.314, and 164.316.

138.    U.S. Vision and USV's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to employ reasonable measures to protect and secure PII/PHI.

139.    U.S. Vision and USV violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiffs' and other Class members' PII/PHI and not complying with applicable industry standards. U.S. Vision and USC's conduct was particularly unreasonable given the nature and amount of PII/PHI they receive and store, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiffs and the other Class members.

140.    U.S. Vision and USV's violation of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitutes negligence per se.

141.    Plaintiffs and Class members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

142.    The harm occurring as a result of the Data Breach is the type of harm HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiffs and Class members as a result of the Data Breach.

143.    It was or should have been reasonably foreseeable to U.S. Vision and USV that their failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiffs' and Class members' PII/PHI to unauthorized individuals.

144.    The injury and harm that Plaintiffs and the other Class members suffered was the direct and proximate result of U.S. Vision and USV's violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA.

145.    Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; (vii) overpayment for the services that were received without adequate data security; (viii) loss of privacy from the unauthorized access and exfiltration of PII/PHI; and (ix) diminished value of PII/PHI.

**COUNT IV**
**NEGLIGENCE PER SE**

**(On Behalf of Plaintiffs and the Nationwide Subclass Against Defendant Nationwide)**

146.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

147.    This claim is brought by Plaintiffs individually and on behalf of the Nationwide Subclass against Nationwide Optometry, P.C.

148.    Nationwide's duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

149.    Nationwide's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to employ reasonable measures to protect and secure PII/PHI.

150.    Nationwide violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiffs' and other Nationwide Subclass members' PII/PHI and not complying with applicable industry standards. Upon information and belief Nationwide did not properly vet U.S. Vision and USV prior to providing them with patient PII/PHI. However, regardless of Nationwide's own conduct, it is liable for the negligence per se of U.S. Vision and USV, which were acting within the scope of their engagement as Nationwide's agents at the time of the Data Breach.

151.    Nationwide's conduct was particularly unreasonable given the nature and amount of PII/PHI it collects from patients, and the foreseeable consequences of a data breach involving

PII/PHI including, specifically, the substantial damages that would result to Plaintiffs and the other Nationwide Subclass members.

152.    Nationwide's violation of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitutes negligence per se.

153.    Plaintiffs and Nationwide Subclass members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

154.    The harm occurring as a result of the Data Breach is the type of harm HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiffs and Nationwide Subclass members as a result of the Data Breach.

155.    It was or should have been reasonably foreseeable to Nationwide that their failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Nationwide Subclass members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiffs' and Nationwide Subclass members' PII/PHI to unauthorized individuals.

156.    The injury and harm that Plaintiffs and the other Nationwide Subclass members suffered was the direct and proximate result of Nationwide's violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiffs and Nationwide Subclass members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii)

out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; (vii) overpayment for the services that were received without adequate data security; (viii) loss of privacy from the unauthorized access and exfiltration of PII/PHI; and (ix) diminished value of PII/PHI.

### COUNT V
### BREACH OF FIDUCIARY DUTY
**(On Behalf of Plaintiffs and the Direct Subclass Against Defendants U.S. Vision and USV)**

157.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

158.    This claim is brought by Plaintiffs individually and on behalf of the Direct Subclass against U.S. Vision, Inc. and USV Optical, Inc.

159.    Plaintiffs and Direct Subclass members provided their PII/PHI to U.S. Vision and USV (or one of their alter egos) in exchange for medical services with the understanding it would be held in confidence, in the course of a medical relationship.

160.    Plaintiffs and Direct Subclass members would not have allowed their information to be provided to U.S. Vision and USV had they known it would not be adequately protected. U.S. Vision's and USV's acceptance and storage of Plaintiffs' and Class members' PII/PHI created a fiduciary relationship between U.S Vision and USV on one hand and Plaintiffs and Class members on the other.

161.    In light of this relationship, U.S. Vision and USV must act primarily for the benefit of their patients, which includes safeguarding and protecting Plaintiffs' and Direct Subclass members' PII/PHI.

162.    U.S. Vision and USV have a fiduciary duty to act for the benefit of Plaintiffs and Direct Subclass members upon matters within the scope of their relationship. They breached that duty by failing to properly protect the integrity of the system containing Plaintiffs' and Direct Subclass members' PII/PHI, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiffs' and Direct Subclass members' PII/PHI that they collected.

163.    As a direct and proximate result of U.S. Vision and USV's breach of their fiduciary duties, Plaintiffs and Direct Subclass members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; (vii) overpayment for the services that were received without adequate data security; (viii) loss of privacy from the unauthorized access and exfiltration of PII/PHI; and (ix) diminished value of PII/PHI.

**COUNT VI**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiffs and the Nationwide Subclass Against Defendant Nationwide)**

164.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

165.    This claim is brought by Plaintiffs individually and on behalf of the Nationwide Subclass against Nationwide Optometry, P.C.

166.    As a condition of obtaining services from Nationwide, Plaintiffs and Nationwide Subclass members gave Nationwide their PII/PHI in confidence, believing that Nationwide would protect that information.

167.    Plaintiffs and Nationwide Subclass members would not have provided Nationwide with this information had they known it would not be adequately protected.

168.    Nationwide's acceptance of Plaintiffs' and Nationwide Subclass members' PII/PHI created a fiduciary relationship between Nationwide and Plaintiffs and Nationwide Subclass members. In light of this relationship, Nationwide must act primarily for the benefit of its patients, which includes safeguarding and protecting Plaintiffs' and Nationwide Subclass members' PII/PHI.

169.    Nationwide has a fiduciary duty to act for the benefit of Plaintiffs and Nationwide Subclass members upon matters within the scope of their relationship. It breached that duty by entrusting Plaintiffs' and Nationwide Subclass members' PII/PHI to U.S. Vision and USV, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiffs' and Nationwide Subclass members' PII/PHI that they collected.

170.    As a direct and proximate result of Nationwide's breach of their fiduciary duties, Plaintiffs and Nationwide Subclass members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention,

detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; (vii) overpayment for the services that were received without adequate data security; (viii) loss of privacy from the unauthorized access and exfiltration of PII/PHI; and (ix) diminished value of PII/PHI.

**COUNT VII**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Direct Subclass Against Defendants U.S. Vision and USV)**

171.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

172.    This claim is brought by Plaintiffs individually and on behalf of the Direct Subclass against U.S. Vision, Inc. and USV Optical, Inc.

173.    In connection with receiving health care services, Plaintiffs and all other Direct Subclass members entered into implied contracts with U.S. Vision and USV.

174.    Pursuant to these implied contracts, Plaintiffs and Direct Subclass members paid money to U.S. Vision and USV and allowed them to access and store their PII/PHI. In exchange, U.S. Vision and USV agreed to take reasonable measures to protect the security and confidentiality of Plaintiffs' and Direct Subclass members' PII/PHI and protect Plaintiffs' and Class members' PII/PHI in compliance with federal and state laws and regulations and industry standards.

175.    The protection of PII/PHI was a material term of the implied contracts between Plaintiffs and Direct Subclass members, on the one hand, and U.S Vision and USV, on the other hand.

176.    Indeed, as set forth *supra*, U.S. Vision and USV recognized the importance of data security and the privacy of their patients' PII/PHI in their representations on their websites. Had Plaintiffs and Direct Subclass members known that U.S. Vision and USV would not adequately protect their patients' and former patients' PII/PHI, they would not have used eyecare services that contracted with U.S. Vision and USV.

177.    Plaintiffs and Direct Subclass members performed their obligations under the implied contract when they, through their eyecare providers, provided U.S. Vision and USV with their PII/PHI and paid for eyecare services.

178.    U.S. Vision and USV breached their obligations under their implied contracts with Plaintiffs and Direct Subclass members in failing to implement and maintain reasonable security measures to protect and secure their PII/PHI, and in failing to implement and maintain security protocols and procedures to protect Plaintiffs' and Direct Subclass members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

179.    U.S. Vision and USV's breach of their obligations of the implied contracts with Plaintiffs and Direct Subclass members directly resulted in the Data Breach and the resulting injuries to Plaintiffs and Direct Subclass members.

180.    Plaintiffs and all other Direct Subclass members were damaged by U.S. Vision and USV's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased and imminent risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national

and international market; (vi) they lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) they overpaid for the services that were received without adequate data security.

<u>COUNT VIII</u>
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Nationwide Subclass Against Defendant Nationwide)**

181.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

182.    This claim is brought by Plaintiffs individually and on behalf of the Nationwide Subclass against Nationwide Optometry, P.C.

183.    In connection with receiving health care services, Plaintiffs and all other Nationwide Subclass members entered into implied contracts with Nationwide.

184.    Pursuant to these implied contracts, Plaintiffs and Nationwide Subclass members paid money to Nationwide and provided Nationwide with their PII/PHI. In exchange, Nationwide agreed to, among other things, and Plaintiffs understood that Nationwide would: (1) provide eyecare services to Plaintiffs and Nationwide Subclass members; (2) take reasonable measures to protect the security and confidentiality of Plaintiffs' and Nationwide Subclass members' PII/PHI; and (3) protect Plaintiffs' and Nationwide Subclass members' PII/PHI in compliance with federal and state laws and regulations and industry standards.

185.    The protection of PII/PHI was a material term of the implied contracts between Plaintiffs and Nationwide Subclass members, on the one hand, and Nationwide, on the other hand.

186.    Indeed, as set forth *supra*, Nationwide recognized the importance of data security and the privacy of their patients' PII/PHI in their representations on their websites. Had Plaintiffs

and Nationwide Subclass members known that Nationwide would not adequately protect its patients' and former patients' PII/PHI, they would not have paid for eyecare services from Nationwide.

187.    Plaintiffs and Nationwide Subclass members performed their obligations under the implied contract when they provided Nationwide with their PII/PHI and paid for eyecare services from Nationwide.

188.    Nationwide breached its obligations under its implied contracts with Plaintiffs and Nationwide Subclass members in failing to implement and maintain reasonable security measures to ensure PII/PHI is protected and secure, and in failing to implement and maintain security protocols and procedures to protect Plaintiffs' and Nationwide Subclass members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

189.    Nationwide's breach of its obligations of the implied contracts with Plaintiffs and Class members directly resulted in the Data Breach and the resulting injuries to Plaintiffs and Nationwide Subclass members.

190.    Plaintiffs and all other Subclass members were damaged by Nationwide's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased and imminent risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) they lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will

continue to face; and (vii) they overpaid for the services that were received without adequate data security.

### COUNT IX
### BREACH OF CONTRACT (THIRD-PARTY BENEFICIARY)
### (On Behalf of Plaintiffs and the U.S. Class against Defendants U.S. Vision and USV)

191.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

192.    This claim is brought by Plaintiffs individually and on behalf of the U.S. Class against U.S. Vision, Inc. and USV Optical, Inc.

193.    Upon information and belief, U.S. Vision and USV contracted with Nationwide to provide data storage and data security services for Nationwide after Nationwide was sold by U.S. Vision and USV.

194.    Acting in the ordinary course of business to provide these contractual services, U.S. Vision and USV obtained and stored  the sensitive PII/PHI of Plaintiffs and Class members.

195.    Upon information and belief, the contract with Nationwide contained provisions requiring U.S. Vision and USV to protect the PII/PHI that U.S. Vision and USV received in order to provide such data storage and data security services in carrying out the business of the contract.

196.    Upon information and belief, these provisions requiring U.S. Vision and USV acting in the ordinary course of business to receive, store, and secure the PII/PHI were intentionally included for the direct benefit of Plaintiffs and Class members, such that Plaintiffs and Class members are intended third party beneficiaries of these contracts, and therefore entitled to enforce them.

197.    Upon information and belief, such contacts between U.S. Vision, USV, and Nationwide were made expressly for the benefit of Plaintiffs and Class members, as it was

Plaintiffs' and Class Members' PII/PHI that U.S. Vision and USV agreed to receive, store, and secure through its services. Thus, the benefit received by collecting and protecting the PII/PHI belonging to Plaintiffs and Class members was the direct and primary objective of the contracting parties and Plaintiffs and Class members were the direct and express beneficiaries of such contracts.

198.    Upon information and belief, U.S. Vision, USV, and Nationwide intended that Plaintiffs and Class members be third-party beneficiaries of the contract between U.S. Vision, USV, and Nationwide for data storage and data security. Plaintiffs and Class members entrusted their sensitive and valuable PII/PHI to Nationwide and Nationwide understood that it had a duty to protect the PII/PHI. When Nationwide contracted with U.S. Vision and USV, the three parties understood that U.S. Vision and USV would store the PII/PHI and that it would benefit Plaintiffs and Class members to have adequate safeguards and security for the PII/PHI.

199.    U.S. Vision and USV knew, or should have known, that if it breached the data storage and data security contract, Plaintiffs and Class members would be harmed.

200.    U.S. Vision and USV breached the contract with Nationwide while acting in the ordinary course of business by not protecting the PII/PHI of Plaintiffs and Class members..

201.    Plaintiffs and all other Class members were damaged by U.S. Vision and USV's breach of the data storage and data security contract (of which they were an intended third-party beneficiary) because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased and imminent risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of

the value of their PII/PHI, for which there is a well-established national and international market; (vi) they lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) they overpaid for the services that were received without adequate data security.

### COUNT X
### UNJUST ENRICHMENT
**(On Behalf of Plaintiffs and the Direct Subclass Against Defendants U.S. Vision and USV)**

202.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

203.    This claim is pleaded in the alternative to the breach of implied contract claim and breach of contract (third-party beneficiary).

204.    This claim is brought by Plaintiffs individually and on behalf of the Direct Subclass against U.S. Vision, Inc. and USV Optical, Inc.

205.    Plaintiff and Direct Subclass members have an interest, both equitable and legal, in their PII/PHI that was conferred upon, collected by, and stored by U.S. Vision and USV and which was stolen in the Data Breach. This information has independent value.

206.    In obtaining services from U.S. Vision and USV, an their alter egos, Plaintiffs and Direct Subclass members provided and entrusted their PII and PHI to U.S. Vision and USV.

207.    Plaintiffs and Class members conferred a monetary benefit upon U.S. Vision and USV in the form of monies paid for eyecare services provided by U.S. Vision and USV, and their alter egos.

208.    U.S. Vision and USV accepted or had knowledge of the benefits conferred upon them by Plaintiffs and Class members. U.S. Vision and USV benefitted from the receipt of

Plaintiffs' and Direct Subclass members' PII/PHI, as this was used to facilitate billing and payment services.

209.    Plaintiffs and Direct Subclass members conferred a monetary benefit upon U.S. Vision and USV by providing Defendants with their valuable PII/PHI, which as a necessary exchange to enable U.S. Vision and USV to fulfill its contractual obligations to Nationwide.

210.    U.S. Vision and USV enriched themselves by saving the costs they reasonably should have expended on data security measures to secure the PII/PHI of Plaintiffs and Direct Subclass members. These cost savings increased the profitability of the contractual services owed by U.S. Vision and USV.

211.    Upon information and belief, instead of providing a reasonable level of security that would have prevented the Data Breach, U.S. Vision and USV instead calculated to avoid their data security obligations at the expense of Plaintiff and Direct Subclass members by utilizing cheaper, ineffective security measures. Plaintiff and Direct Subclass members, on the other hand, suffered as a direct and proximate result of U.S. Vision's and USV's failure to provide the requisite security.

212.    As a result of U.S. Vision and USV's conduct, Plaintiffs and Direct Subclass members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiffs and Direct Subclass members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

213.    Under the principles of equity and good conscience, U.S. Vision and USV should not be permitted to retain the money belonging to Plaintiffs and Direct Subclass members because Defendants failed to adequately implement the data privacy and security procedures for themselves

that Plaintiffs and Direct Subclass members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

214.    U.S. Vision and USV should be compelled to provide for the benefit of Plaintiffs and Direct Subclass members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

## COUNT XI
## UNJUST ENRICHMENT
**(On Behalf of Plaintiffs and the Nationwide Subclass Against Defendant Nationwide)**

215.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

216.    This claim is pleaded in the alternative to the breach of implied contract claim.

217.    This claim is brought by Plaintiffs individually and on behalf of the Nationwide Subclass against Nationwide Optometry, P.C.

218.    In obtaining services from Nationwide, Plaintiffs and Nationwide Subclass members provided and entrusted their PII and PHI to Nationwide.

219.    Plaintiffs and Nationwide Subclass members conferred a monetary benefit upon Nationwide in the form of monies paid for eyecare services.

220.    Nationwide accepted or had knowledge of the benefits conferred upon it by Plaintiffs and Nationwide Subclass members. Nationwide also benefitted from the receipt of Plaintiffs' and Nationwide Subclass members' PII/PHI, as this was used to facilitate billing and payment services.

221.    As a result of Nationwide's conduct, Plaintiffs and Nationwide Subclass members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiffs and

Nationwide Subclass members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

222.    Nationwide should not be permitted to retain the money belonging to Plaintiffs and Nationwide Subclass members because Nationwide failed to adequately implement the data privacy and security procedures for itself that Plaintiffs and Nationwide Subclass members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

223.    Nationwide should be compelled to provide for the benefit of Plaintiffs and Nationwide Subclass members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

## COUNT XII
### VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT
### A.R.S. §§ 44-1521 *et seq*. ("ACFA")
### (On Behalf of Plaintiffs Torres, Odell, and the Arizona Subclass Against U.S. Vision and USV)

224.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

225.    This claim is brought by Plaintiffs Torres and Odell individually and on behalf of the Arizona Subclass against U.S. Vision, Inc. and USV Optical, Inc.

226.    U.S. Vision and USV are each a "person" as defined by A.R.S. §44-1521(6).

227.    U.S. Vision and USV sold Plaintiffs and Arizona Subclass Members "merchandise," as defined by A.R.S. § 44-1521, in the form of services.

228.    Section 44-1522 of the Arizona Consumer Fraud Act was amended in 2013 to include a prohibition on "unfair" acts and practices. The statute provides that,

> The act, use or employment by any person of any … unfair act or practice … in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby.

A.R.S. § 44-1522(A).

229.    U.S. Vision and USV, themselves and through their alter egos, represented publicly that they were committed to privacy and the security of personal and confidential data that they collected and stored.

230.    U.S. Vision and USV engaged in unfair acts and practices in violation of the ACFA by failing to implement and maintain reasonable security measures to protect and secure Plaintiffs' and Arizona Subclass members' PII/PHI in a manner that complied with applicable laws, regulations, and industry standards. The failure to implement and maintain reasonable data security measures offends established public policy, is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

231.    U.S. Vision and USV could have prevented the Data Breach by properly securing and encrypting the folders, files, and/or data fields containing the PII/PHI of Plaintiffs, or alternatively, the USV Defendants should have destroyed the data it no longer had a reasonable need to maintain or only stored data in an Internet-accessible environment when there was a reasonable need to do so and with proper safeguards. Moreover, before the Data Breach, U.S. Vision and USV should have adequately trained their employees to recognize and detect phishing attempts, implemented multi-factor authentication on the accounts with passwords that were compromised, encrypted data when not in use, and regularly updated its passwords.

232.    But for U.S. Vision's and USV's failure to implement and follow reasonable data security measures, the Data Breach would not have occurred and/or Plaintiffs' and Arizona Subclass members' PII/PHI would not have been accessed by cybercriminals.

233.    U.S. Vision and USV knew or should have known that its computer system and data security practices were inadequate to safeguard Plaintiffs' and Arizona Subclass members' PII/PHI, and that the risk of a data breach or theft was highly likely.

234.    Due to the Data Breach, Plaintiffs and Arizona Subclass members have lost property in the form of their PII/PHI. Further, U.S. Vision's and USV's failure to adopt reasonable practices in protecting and safeguarding its patients' PII/PHI will force Plaintiffs and Arizona Subclass members to spend time or money to protect against identity theft. Plaintiffs and Arizona Subclass members are now at a higher risk of medical identity theft and other crimes. This harm sufficiently outweighs any justifications or motives for the U.S. Vision's and USV's practice of collecting PII/PHI without appropriate and reasonable safeguards to protect such information.

235.    Plaintiffs and all other Arizona Subclass members were damaged by U.S. Vision's and USV's violation of the ACFA because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) they lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) they overpaid for the services that were received without adequate data security.

## COUNT XIII
## VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT
### A.R.S. §§ 44-1521 *et seq*. ("ACFA")

**(On Behalf of Plaintiffs Torres and Odell and the Arizona Nationwide Subclass Against Nationwide)**

236.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

237.    This claim is brought by Plaintiffs Torres and Odell individually and on behalf of the Arizona Nationwide Subclass against Nationwide Optometry, P.C.

238.    Nationwide is a "person" as defined by A.R.S. §44-1521(6).

239.    Nationwide sold Plaintiffs and Arizona Nationwide Subclass members "merchandise," as defined by A.R.S. § 44-1521, in the form of services.

240.    Section 44-1522 of the Arizona Consumer Fraud Act was amended in 2013 to include a prohibition on "unfair" acts and practices. The statute provides that,

> The act, use or employment by any person of any … unfair act or practice ... in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby.

A.R.S. § 44-1522(A).

241.    Nationwide represented publicly that it was committed to privacy and the security of personal and confidential data that they collected and stored.

242.    Nationwide engaged in unfair acts and practices in violation of the ACFA by failing to implement and maintain reasonable security measures to protect and secure Plaintiffs' and Arizona Nationwide Subclass members' PII/PHI in a manner that complied with applicable laws, regulations, and industry standards. The failure to implement and maintain reasonable data security measures offends established public policy, is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

243.    Nationwide could have prevented Plaintiffs and Arizona Nationwide Subclass members from being harmed by the Data Breach by providing proper security for their PII/PHI.

This includes ensuring that all businesses with whom it contracts for data security and storage will adequately protect the PII/PHI that Nationwide provides to them.

244.    But for Nationwide's failure to implement and follow reasonable data security measures, Plaintiffs' and Arizona Nationwide Subclass members' PII/PHI would not have been accessed by cybercriminals.

245.    Nationwide knew or should have known that the USV Defendants' computer system and data security practices were inadequate to safeguard Plaintiffs' and Arizona Nationwide Subclass members' PII/PHI, and that the risk of a data breach or theft was highly likely.

246.    Due to the Data Breach, Plaintiffs and Arizona Nationwide Subclass members have lost property in the form of their PII/PHI. Further, Nationwide's failure to adopt reasonable practices in protecting and safeguarding its patients' PII/PHI will force Plaintiffs and Arizona Subclass members to spend time or money to protect against identity theft. Plaintiffs and Arizona Subclass members are now at a higher risk of medical identity theft and other crimes. This harm sufficiently outweighs any justifications or motives for Nationwide's practice of collecting PII/PHI without appropriate and reasonable safeguards to protect such information.

247.    Plaintiffs and all other Arizona Subclass members were damaged by Nationwide's violation of the ACFA because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market;

(vi) they lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) they overpaid for the services that were received without adequate data security.

**COUNT XIV**
**VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT**
**N.J. Stat. §§ 56:8-1 *et seq*. ("NJCFA")**
**(On Behalf of Plaintiffs and the U.S. Class Against Defendants U.S. Vision and USV)**

248.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

249.    This claim is brought by Plaintiffs individually and on behalf of the U.S. Class against U.S. Vision, Inc. and USV Optical, Inc.

250.    The NJCFA states:

> The act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J. Stat. § 56:8-2.

251.    Plaintiffs, Class members, and the USV Defendants are "persons" under the NJCFA. N.J. Stat. § 56:8-1(d).

252.    The services that  U.S. Vision and USV provided are "merchandise" pursuant to the NJCFA. N.J. Stat. § 56:8-1(c).

253.    U.S. Vision and USV engaged in unconscionable acts and practices in violation of the NJCFA by failing to implement and maintain reasonable security measures to protect and secure Plaintiffs' and Class members' PII/PHI in a manner that complied with applicable laws,

regulations, and industry standards. The failure to implement and maintain reasonable data security measures offends established public policy, is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

254.    U.S. Vision and USV could have prevented the Data Breach by properly securing and encrypting the folders, files, and/or data fields containing the PII/PHI of Plaintiffs, or alternatively, U.S. Vision and USV should have destroyed the data they no longer had a reasonable need to maintain or only stored data in an Internet-accessible environment when there was a reasonable need to do so and with proper safeguards. Moreover, before the Data Breach, U.S. Vision and USV should have adequately trained their employees to recognize and detect phishing attempts, implemented multi-factor authentication on the accounts with passwords that were compromised, encrypted data when not in use, and regularly updated its passwords.

255.    Due to the Data Breach, Plaintiffs and Class members have lost property in the form of their PII/PHI. Further, U.S. Vision's and USV's failure to adopt reasonable practices in protecting and safeguarding their patients' PII/PHI will force Plaintiffs and Class members to spend time or money to protect against identity theft.

256.    Plaintiffs and Class members are now at a substantially higher risk of medical identity theft and other crimes. This harm sufficiently outweighs any justifications or motives for U.S. Vision's and USV's practice of collecting and storing PII/PHI without appropriate and reasonable safeguards to protect such information.

257.    Plaintiffs and all other Class members were damaged by U.S. Vision's and USV's violation of the NJCFA because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they

are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) they lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) they overpaid for the services that were received without adequate data security.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all other members of the Class, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A.    Certifying the Classes as requested herein;

B.    Awarding Plaintiffs and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.    Awarding Plaintiffs and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, on behalf of themselves and the Class, seek appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.    Awarding Plaintiffs and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.      Awarding Plaintiffs and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.      Awarding Plaintiffs and the Class such other favorable relief as allowable under law.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.


Dated: June 19, 2024                                Respectfully submitted,

                                                    */s/ Janine Pollack*_____
                                                    Janine Pollack
                                                    **GEORGE FELDMAN MCDONALD, PLLC**
                                                    745 Fifth Avenue, Suite 500
                                                    New York, NY 10151
                                                    Tel: 561-232-6002
                                                    Fax: 888-421-4173
                                                    jpollack@4-Justice.com

                                                    *Local Counsel*

                                                    Ben Barnow*
                                                    Anthony L. Parkhill*
                                                    **BARNOW AND ASSOCIATES, P.C.**
                                                    205 West Randolph Street, Ste. 1630
                                                    Chicago, IL 60606
                                                    Tel: 312-621-2000
                                                    Fax: 312-641-5504
                                                    b.barnow@barnowlaw.com
                                                    aparkhill@barnowlaw.com

                                                    Terence R. Coates*
                                                    Justin C. Walker*
                                                    **MARKOVITS, STOCK & DEMARCO, LLC**
                                                    119 E. Court Street, Suite 530
                                                    Cincinnati, OH 45202
                                                    Phone: (513) 651-3700
                                                    Fax: (513) 665-0219
                                                    tcoates@msdlegal.com

jwalker@msdlegal.com

Jean S. Martin*
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 559-4908
jeanmartin@ForThePeople.com

*Interim Co-Lead Counsel*

Gary M. Klinger*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Phone: (312) 224-8488
gklinger@milberg.com

Victoria Maniatis
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
100 Garden City Plaza, Suite 500
Garden City, New York 11530
Tel.: (212) 594-5300
vmaniatis@milberg.com

*Additional Plaintiffs' Counsel*

*\*admitted pro hac vice*